**United States District Court**
**District of Massachusetts**

```
                                    )
UNITED STATES OF AMERICA,           )
                                    )
          v.                        )
                                    )   Criminal Action No.
Daryle Smith,                       )   13-10064-NMG
                                    )
          Defendant.                )
                                    )
```

**MEMORANDUM & ORDER**

**GORTON, J.**

This case arises out of a stop, search and seizure that took place in Watertown, Massachusetts in December, 2012. Defendant Daryle Smith ("Smith" or "defendant") moves 1) to suppress the fruits of the search and seizure which he claims violated his constitutional rights under the Fourth Amendment, 2) to suppress statements he claims were obtained in violation of his Fifth Amendment rights and 3) for an evidentiary hearing. In light of precedent contrary to Smith's claims and for the reasons set forth below the Court will deny defendant's motions to suppress and for an evidentiary hearing. The government's motion to strike the request for an evidentiary hearing will be denied as moot.

## I.    Factual Background

At approximately 9:00 P.M. on December 16, 2012, Adam D'Agostino (D'Agostino) called 911, gave his name as Adam and

said someone in a car had waved a gun outside of his home in Watertown.  D'Agostino described a black male passenger brandishing a gun and a white female driving the car.

A few minutes after the call, Watertown Police Officer Robert Kelly ("Officer Kelly") arrived on the scene and spoke to residents of the house where the incident occurred: Kevin Szydloski, Denis Delorey and Adam D'Agostino who explained that the incident began with an altercation between Michael Morrisey, who lived at the same address, and his ex-girlfriend, Elizabeth Singleman.  All of these individuals will hereafter be referred to by their surnames.  Singleman was attempting to recover money from Morrissey but she was dissatisfied with the amount of money she received from him.  As Singleman drove away, her passenger allegedly waved a gun outside the passenger side window. D'Agostino believed the male passenger was a man known as "Clockmaster" who "ran" a housing project in Brighton.  Officer Kelly left the premises and called the Boston Police, from which he learned that "Clockmaster" was an alias for the defendant, Daryle Smith.  A database search revealed that Smith had a criminal record and was a felon.  Thus if the reports of Smith brandishing a gun were true, he would be in violation of 18 U.S.C. § 922(g)(1), as a felon in possession of a firearm.

Morrissey called 911 at approximately 4:00 A.M. and stated that the man who had brandished the gun had returned.  The

-2-

dispatcher told the responding officers to perform a felony stop which would allow them to take additional safety precautions, including turning on their cruisers' flashing lights and remaining in the car while using the loud-speaker system to instruct suspects.

Officer Brandon O'Neill ("Officer O'Neill") arrived at the scene in time to see a white woman and black man walking away from a gas station trash container next to the house where the first incident had occurred.  Officer O'Neill turned on his cruiser's flashing lights as the couple entered their car. O'Neill used his loud-speaker system to instruct the couple to move to the outside rear of the car.  They complied and Officer O'Neill got out of his vehicle with his firearm drawn.  Sergeant John McLellan ("Sergeant McLellan") and Officer Catherine Welch ("Officer Welch") then arrived.

Sergeant McLellan frisked Smith, found a bag of bullets in his pants pocket and questioned him about the bullets, whether he had a gun and, if so, where it was located.  Smith became angry, loud and disruptive and began yelling about Morrissey's mistreatment of Singleman.  He also began waving his arms despite having been instructed to keep them on the car. Sergeant McLellan responded by placing Smith in handcuffs. Officer Welch searched the car and the surrounding area and found a gun under a trash container.

Smith and Singleman were arrested for possessing a firearm without a permit.  Smith was read his Miranda rights but nevertheless made several statements, including that the bullets in his pocket were his, that he had a tattoo of the word "Clockmaster" but not that he had waved a gun.  Smith then refused to answer further questions about the gun.

## II.  Analysis

Smith's motion to suppress are premised on grounds that: 1) his Fourth Amendment rights were violated when he was stopped without probable cause and subjected to an unreasonable search and seizure and 2) statements he made during the stop were obtained in violation of his Fifth Amendment rights.  He has moved for an evidentiary hearing on his motion to suppress.

### A. Legal Standard

Under the Fourth Amendment, individuals have the right to be free from unreasonable searches and seizures.  That right is, however, limited because law enforcement officers may approach individuals without probable cause and investigate what they perceive to be potential criminal activity. Terry v. Ohio, 392 U.S. 1, 24 (1968).  An officer need not have probable cause but must have a "reasonable, articulable suspicion that criminal activity is afoot." United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004).  This suspicion must stem from specific facts

and rational inferences. Terry, 392 U.S. at 21.  While conducting a Terry stop, an officer is allowed to search for weapons, ordinarily through a frisk. Id. at 24.

Reasonable suspicion for a Terry stop may be established through information supplied by informants that bears sufficient indicia of reliability. Alabama v. White, 496 U.S. 325, 329 (1990).  Relevant indicia of reliable information include whether the informant has been identified or can be identified. Florida v. J.L., 529 U.S. 269 (2000).  Courts apply a two-prong test to determine whether a Terry stop was reasonable, first asking whether the initial stop was reasonable and then assessing whether the officers' actions during the stop were reasonably related to the stop's initial rationale.

### B. Application

#### 1. Fourth Amendment

Smith contends that his seizure was a de facto arrest and not a Terry stop. The government responds that the incident was a valid Terry stop and frisk which did not violate Smith's Fourth Amendment rights.  The Court finds that the inception of the stop falls within Terry parameters because the police officers were operating under reasonable suspicion created by interactions with reasonably reliable witnesses and because the beginning of the stop was reasonably justified under the

circumstances.  Although initially reasonable, however, the scope of the stop exceeded the Terry boundaries and ripened into a de facto arrest.

### i.   Reasonable Suspicion

The responding police officers claim they were operating under reasonable suspicion created by the two 911 calls and the officers' encounter with D'Agostino, Delorey and Szydlowski. Such encounters with "informants" meet the reliability test under the J.L. decision.  In the initial 911 call, D'Agostino identified himself by his first name and his telephone number. See, United States v. Andrade, 551 F.3d 103 (1st Cir. 2008). Shortly thereafter, Officer Kelly went to D'Agostino's residence and spoke to D'Agostino, Szydlowski and Delorey.  They relayed the same story D'Agostino told the 911 dispatcher about a fight between Singleman and Morrissey and Smith brandishing a gun as he and Singleman drove away.  Officer Kelly stated that he found their testimony credible because they appeared to be scared of Smith.  Based on those interactions and Officer Kelly's own assessment of the witnesses, the Court finds the informants credible because they were willing to be identified and their descriptions of Smith and Singleman were later corroborated.

### ii.   Reasonable in its Inception

Specific facts and rational inferences need to show that the stop was justified at its inception. United States v. Maguire, 359 F.3d 71, 76 (1st Cir. 2004).  The officers did have specific facts at hand due to the credible tip and the circumstances surrounding the incident. See, White, 496 U.S. at 329.  The tip revealed that the officers had reason to believe the suspect in question was a felon and therefore, was not permitted to carry the handgun he reportedly brandished.

The circumstances surrounding the incident also render the stop reasonable.  The time of night, location and the reappearance of a couple meeting the general description provided by D'Agostino, Szydlowski and Delorey and friends may have led the officers to have more reason for caution.  It was close to 4:00 A.M. at a location where someone had previously reported a white woman with a black man who was waving a gun.  A couple matching that description was then seen walking away from the parking lot adjacent to the house where the incident had occurred.  The presence of a couple suspected of having a gun and the lateness of the hour were reasonable factors in the officers' decision to take extra precautions. See, United States v. Pontoo, 666 F.3d 20, 28 (1st Cir. 2011).  Courts may draw upon facts such as these and use them to assess the totality of

the circumstances and justify a stop at its inception. United
States v. Trullo, 809 F.2d 108, 111 (1st Cir. 1987).  Under the
circumstances, the officers acted reasonably when they stopped
Smith and Singleman.

### iii. Scope of the Stop

After determining that the stop was initially reasonable,
the inquiry turns to whether the officers' actions were
reasonably related in scope to the justification for the stop.
If the scope was unreasonable, a Terry stop ripens into a de
facto arrest. Hayes v. Florida, 470 U.S. 811, 815 (1985).
Whether that occurs depends on a number of factors but the
degree of physical restraint placed upon the suspect is
dispositive. United States v. Trueber, 238 F.3d 79, 93-94 (1st
Cir. 2001).

The threshold question for when a suspect is considered to
be under de facto arrest is whether a reasonable person in the
suspect's position would have thought he was under police
custody in a position akin to a formal arrest and not simply
being questioned by police. Trueber, 238 F.3d at 93.  The
suspect must reasonably believe that he or she is not free to
leave. United States v. Mittel-Carey, 493 F.3d 36, 40 (1st Cir.
2007).  As a traditional element of an arrest, the use handcuffs
has a significant bearing upon the analysis of whether a

defendant reasonably feels free to leave.  United States v.
Mendenhall, 446 U.S. 544, 554 (1980).  Terry stop boundaries
were exceeded when Smith was placed in handcuffs because a
reasonable person in his situation would not have felt free to
leave.  This Court concludes that the use of handcuffs at that
point exceeded the scope of a Terry stop and constituted a de
facto arrest.

### iv.  Suppression

Smith argues that because he was effectively under arrest
prior to being read his rights, all of the evidence obtained
from that night should be suppressed.  The Court agrees that the
stop was a de facto arrest but not that all of the evidence
subsequently obtained must be suppressed. See United States v.
Ryan, 729 F. Supp. 2d 479, 483 (D. Mass. 2010).  The bullets
were retrieved while the stop was within the boundaries set by
Terry before it ripened into an arrest. The bullets were
lawfully taken from defendant's possession and will not be
suppressed as evidence. See, United States v. Am, 564 F.3d 25,
33 (1st Cir. 2009).

Nor will the gun be suppressed because it is admissible
under Miranda's public safety exception.  Situations in which a
suspect is in custody and a reported gun has not been found
generally fall under this exception. New York v. Quarles, 467

U.S. 649 (1984).  As in Quarles, the officers in the instant
case were faced with a suspect in custody and a gun that was
unaccounted for in a public space.  While it was unlikely that
someone would find the gun at 4:00 A.M., the officers would have
been derelict had they not searched for the gun after
discovering the bullets on Smith's person.  Defendant's argument
that the incident occurred too early in the morning to be a
threat to public safety ignores the fact that the arrest took
place in a public space where any number of people could have
found the gun within a few hours.  Once a suspect has been
validly stopped, frisked and found to possess ammunition, a
competent police officer will properly attempt to secure any
weapons in the area to avoid present and future harm. United
States v. Chan, 901 F. Supp. 480, 485 (D. Mass. 1995).  Finding
and securing the gun was a matter of public safety and will not
be suppressed.

### 2. Fifth Amendment

Smith also seeks to suppress his statements made to the
police during the stop which he claims were obtained in
violation of his Fifth Amendment rights under Miranda. See,
United States v. Guerrier, 669 F.3d 1, 5 (1st Cir. 2011).  The
public safety exception applies to all statements related to the
gun and the bullets, including any answers provided in response

to Officer McLellan's questions on those matters.  United States
v. Shea, 150 F.3d 44, 48 (1st Cir. 1998) (holding that the
public safety exception applies to questions about weapons).
The rationale applicable to the weapon itself applies with equal
force to statements about the weapon.  See United States v.
Sophoan Oung, 490 F. Supp. 2d 21, 33 (D. Mass. 2007).  The
subject statements regarding the bullets and weapons were made
in response to valid questions that sought to secure a gun that
posed a potential threat to the public.

Because the public safety exception applies to any and all
statements made with respect to the gun and ammunition, the
motion to suppress those statements will be denied.  Any
statement that Smith may have volunteered will not be suppressed
because they are not barred by the Fifth Amendment. See,
Miranda, 384 U.S. 436, 478 (1966). On the other hand, because
Smith was under de facto arrest and statements not relating to
the gun and ammunition do not fall within the public safety
exception, statements made before he was given his Miranda
warning will be suppressed. See, United States v. Arroyo, 2013
U.S. Dist. LEXIS 133399 at *18-19(D. Mass. Sept. 17, 2013)

### 3. Evidentiary Hearing

Smith moved for an evidentiary hearing in a perfunctory
fashion.  The decision to conduct an evidentiary hearing is

solely within the Court's discretion. United States v. Calderon, 77 F.3d 6, 9 (1st Cir. 1996).  In order to obtain an evidentiary hearing, a defendant needs to make a sufficient showing that a warrantless search occurred by alleging specific and detailed facts to support such a claim. United States v. Brown, 621 F.3d 48 (1st Cir. 2010) (internal citations omitted). A defendant's affidavit is not sufficient to make such a showing if it contains only conclusory statements. United States v. Southard, 700 F.2d 1, 10 (1st Cir. 1983).  Finally, a defendant needs to show that there are factual disputes that would entitle him to relief if they were resolved in his favor. Id.

Smith's affidavit is entirely conclusory and simply states that he did not feel free to leave.  More importantly, he has not shown that there are any facts in dispute.  He relies on police reports and other government-produced materials for his submissions and motion.  While Smith claims those facts do not justify the seizure, he does not dispute the facts themselves. Accordingly, the motion for an evidentiary hearing will be denied and the government's motion to strike the defendant's request for an evidentiary hearing will be denied as moot.

**ORDER**

In accordance with the foregoing, defendant's motion to suppress (Docket No. 31) is, with respect to matters unrelated to the handgun, bullets and statements concerning those objects, **ALLOWED**, but in all other respects, **DENIED**.  The government's motion to strike defendant's request for an evidentiary hearing (Docket No. 43) is **DENIED** as moot.


**So ordered.**

/s/ Nathaniel M. Gorton_____
Nathaniel M. Gorton
United States District Judge

Dated November 13, 2013